02-10-564-CR








 




 
 
 
 
 
  
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
 
 




 

 

NO. 02-10-00564-CR

 

 




 
 
 SAMUEL JONES
 
 
  
 
 
 APPELLANT
 
 




                                                                                                                             

V.

 




 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 




 

 

------------

FROM THE 367TH DISTRICT
COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION[1]

------------

I.  Introduction

In two issues, Appellant Samuel Jones
appeals his conviction for aggravated robbery with a deadly weapon, arguing
that he received ineffective assistance of counsel and that he was denied due
process because two witnesses, Don Cocanaugher and Rebecca Self, were absent
from his trial.  We affirm.

II.  Factual and Procedural
Background

Jones was charged with committing the
aggravated robbery with a deadly weapon of Dr. Joseph Surdacki based on the
events of July 23, 2006, recounted below in our discussion of Jones’s issues.

On October 13, 2008, Jones’s counsel
requested subpoenas for Cocanaugher and Self to appear on October 16, 2008.  Jones’s
trial began on October 14, 2008, and concluded on October 16, 2008, at around
10:09 a.m., when the jury assessed Jones’s punishment of life imprisonment and
the trial court entered judgment on the verdict.[2] 
At 1:26 p.m. that day, the constable filed the return of the subpoenas for
Cocanaugher and Self, indicating that they could not be served because their
addresses for service were not in Denton County.

After we dismissed Jones’s appeal for
want of jurisdiction, see Jones v. State, No. 02-08-00465-CR, 2009 WL
160945, at *1 (Tex. App.—Fort Worth Jan. 22, 2009, no pet.) (mem. op., not
designated for publication), the court of criminal appeals granted Jones an
out-of-time appeal.  See Ex parte Jones, No. AP-76454, 2010 WL 4679958,
at *1 (Tex. Crim. App. Nov. 17, 2010) (not designated for publication).

Jones filed a pro se notice of appeal
and application for appointment of appellate counsel.  He also filed a pro se
motion for new trial, alleging that his trial counsel had been ineffective for
not interviewing Cocanaugher and Self and complaining that the trial court had abused
its discretion by denying his motion for continuance to obtain Cocanaugher and
Self as witnesses.

Jones attached an unsworn statement
to his motion for new trial, in which he set forth his belief that Cocanaugher
and Self would have corroborated his claims and defenses and that he would not
have been compelled to testify on his own behalf at trial if they had been
there, and he argued that the trial court denied the motion for continuance
“in-order to injure [his] 14th Amendment Constitutional right to Due Process,
[his] right to present witnesses in [his] behalf, and the right to a fair and
impartial trial.”[3] 
Counsel was appointed for Jones’s appeal, and this appeal followed.

III.  Ineffective Assistance of
Counsel

In his second issue, Jones argues
that he was denied effective assistance of counsel when his trial counsel
failed to investigate or interview Cocanaugher and Self on his behalf in
preparation for trial, failed to ensure that they were subpoenaed, and failed
to timely file a motion for new trial and notice of appeal after his
conviction.

We overrule the last two portions of
this issue because the court of criminal appeals has already addressed them by
granting Jones’s petition for an out-of-time appeal.  See Mestas v. State,
214 S.W.3d 1, 4 (Tex. Crim. App. 2007) (stating that the effect of granting an
out-of-time appeal is that it restores the defendant to the position he
occupied immediately after the trial court signed the judgment of conviction, putting
him in the position of being able to file a timely motion for new trial and notice
of appeal); Burrus v. State, 266 S.W.3d 107, 116 (Tex. App.—Fort Worth
2008, no pet.) (stating, with regard to the court of criminal appeals’s grant
of an out-of-time appeal, that “[s]ince Burrus was returned to a point at which
she could give notice of appeal, she was also at a point where she could file a
motion for new trial.”).

With regard to the first part of his
second issue, Jones argues that it is “inconsevable [sic] to believe that an
attorney would believe that the only two witnesses who observed the offense
other than the complainant and the defendant would not have anything to add to
appellant’s defense[,] especially when appellant faced a potential life
sentence.”[4]

A.  Standard of Review

To establish ineffective assistance
of counsel, the appellant must show by a preponderance of the evidence that his
counsel’s representation fell below the standard of prevailing professional
norms and that there is a reasonable probability that, but for counsel’s
deficiency, the result of the trial would have been different.  Strickland
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Davis v.
State, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009).

In evaluating the effectiveness of
counsel under the first prong, we look to the totality of the representation
and the particular circumstances of each case.  Thompson v. State, 9
S.W.3d 808, 813 (Tex. Crim. App. 1999).  The issue is whether counsel’s
assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland,
466 U.S. at 688–89, 104 S. Ct. at 2065.  Review of counsel’s representation is highly
deferential, and the reviewing court indulges a strong presumption that counsel’s
conduct fell within a wide range of reasonable representation.  Salinas v.
State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); Mallett v. State,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

A reviewing court will rarely be in a
position on direct appeal to fairly evaluate the merits of an ineffective
assistance claim.  Salinas, 163 S.W.3d at 740; Thompson, 9 S.W.3d
at 813–14.  “In the majority of cases, the record on direct appeal is
undeveloped and cannot adequately reflect the motives behind trial counsel’s
actions.”  Salinas, 163 S.W.3d at 740 (quoting Mallett, 65 S.W.3d
at 63).  To overcome the presumption of reasonable professional assistance,
“any allegation of ineffectiveness must be firmly founded in the record, and
the record must affirmatively demonstrate the alleged ineffectiveness.”  Id.
(quoting Thompson, 9 S.W.3d at 813).  It is not appropriate for an
appellate court to simply infer ineffective assistance based upon unclear
portions of the record.  Mata v. State, 226 S.W.3d 425, 432 (Tex. Crim.
App. 2007).

The second prong of Strickland
requires a showing that counsel’s errors were so serious that they deprived the
defendant of a fair trial, i.e., a trial with a reliable result.  Strickland,
466 U.S. at 687, 104 S. Ct. at 2064.  In other words, the appellant must
show there is a reasonable probability that, but for counsel’s unprofessional
errors, the result of the proceeding would have been different.  Id. at
694, 104 S. Ct. at 2068.  A reasonable probability is a probability sufficient
to undermine confidence in the outcome.  Id.  The ultimate focus of our
inquiry must be on the fundamental fairness of the proceeding in which the
result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

An appellant claiming ineffective
assistance of counsel at trial must identify the allegedly erroneous acts and
omissions of counsel.  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; Cooper
v. State, 333 S.W.3d 859, 867 (Tex. App.—Fort Worth 2010, pet. ref’d).  The
appellate court then determines whether, in light of all the circumstances,
these identified acts or omissions were outside the wide range of competent
assistance.  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; Cooper,
333 S.W.3d at 867.

B.  Totality of the Representation

1.  The State’s Evidence

At around 2:50 p.m. on July 23, 2006,
Jones carjacked Baki Sulanc at gunpoint in a Lowe’s parking lot in Carrollton
as Sulanc opened the door to his gold Lexus SUV.  Sulanc cried out for help as
he struggled with Jones.  Paul Palnau heard Sulanc and went to assist him.  Jones
pointed his gun at Palnau before fleeing the scene in the gold SUV.

During Jones’s flight, the gold SUV
rolled over into a ditch.  Dr. Surdacki saw the gold SUV in the ditch and
stopped to offer assistance.  Jones opened the door of Dr. Surdacki’s black SUV,
pointed a gun at Dr. Surdacki’s head, and told him to get out of the vehicle.  Dr.
Surdacki said that he was afraid Jones was going to shoot him, so he exited the
vehicle.  Jones then got into the vehicle and fled the scene.

Around 3:10 p.m., Carrollton Police
Officer Tim Adamo drove into Denton County, saw the overturned gold SUV, and
met with Dr. Surdacki and some bystanders.  Officer Adamo stated that Dr.
Surdacki was emotionally shaken and upset and told him that Jones had pointed a
gun at his head and had stolen his vehicle.

When Palnau learned about the SUV
rollover, he went to find out what he could about it for Sulanc.  He arrived at
the rollover scene and encountered Dr. Surdacki, who was “extremely
distraught,” shaking, trembling, and upset.  Palnau said that when he asked Dr.
Surdacki if he was all right, Dr. Surdacki told him, “He just put his gun to my
head and told me to get out of the car.  I thought he was going to kill me and
I wasn’t going to see my wife [again].  I thought I was going to die.”[5]
 During cross-examination, Palnau denied that Dr. Surdacki had said anything to
him about Jones trying to trick him out of his vehicle and that Dr. Surdacki
told him only that Jones had put a gun to his head and told him to get out of
the car.

A couple—Cocanaugher and Self—had pulled
up in a pickup truck as Jones drove away.  Dr. Surdacki said that they were “just
literally braking and stopping as [Jones] was taking off in [Dr. Surdacki’s
SUV].”  Dr. Surdacki stated that the couple told him that it looked as if he
had rolled the gold SUV and Jones had stopped to ask him if he needed help.  During
cross-examination by Jones’s counsel, Officer Adamo said that he took
statements from Cocanaugher and Self, that both witnesses told him that they
drove up and saw a black person get in the car and head off, and that neither
said anything about a gun.

Not long after stealing Dr. Surdacki’s
SUV, Jones approached Eduardo Jiminez’s vehicle at a truck stop in Fairview and
asked Jiminez for a “jump.”  Jiminez told Jones that he did not have jumper
cables, and Jones said that he had cables.  When Jiminez’s wife turned their
car towards the black SUV, Jones pointed his gun at Jiminez.  Jiminez grabbed
at the gun, and he and Jones wrestled while Jiminez yelled for his wife to take
the car and leave.  Jiminez’s wife took off, and Jones ran to Christie Bundren’s
eighteen-wheeler.[6]

Bundren testified that Jones opened
the driver’s side door of the truck, jumped in, put a gun to her head, and told
her, “Drive, bitch, or I’ll kill you.”  During the five-hour ordeal that
followed, Jones kept the gun pointed at Bundren’s waist.  Jones had Bundren
drive him to his sister’s house while the police chased them.  Police
surrounded the eighteen-wheeler while Jones dragged Bundren into the truck’s
sleeper area and used Bundren’s cell phone to talk with SWAT team negotiators.  Eventually,
Jones had Bundren return to the driver’s seat, and she resumed driving with the
police still following.

The truck stopped after the police
spiked its tires and shot out its radiator.  After the truck stopped, Jones
pulled Bundren back into the sleeper area, keeping the gun to her head.  Bundren
begged Jones not to shoot her, and then she managed to grab the gun and jump
out of the truck.

Carrollton Police Officer David
Taylor dusted Sulanc’s SUV for fingerprints and testified that Jones’s
fingerprints matched the latent prints that he had found.  Officer Taylor also
found a spring inside the gold SUV that was consistent with the shape of a
spring for an ammunition magazine.  Denton County Deputy Sheriff Jeff Coats
processed Dr. Surdacki’s SUV and found a .380 semi-automatic magazine that had
come apart because it was missing its push spring, as well as two or three
loose bullets that fit the magazine.  Collin County Deputy Sheriff Diane Stubbs
testified that she processed Bundren’s eighteen-wheeler with Deputy Coats on
July 24, 2006, where they found Dr. Surdacki’s lab coat and State’s Exhibit 33,
a .380 caliber gun, which was unloaded.

2.  Jones’s Testimony

After the State rested, Jones’s
counsel informed the trial court that Jones planned to testify.  Jones’s
counsel and the trial court both questioned Jones about whether he understood
the consequences of his decision to testify, and Jones told them that he did.[7] 
Jones agreed that his counsel had informed him that he thought Jones should not
testify.[8]

Jones told the jury that at no point
had he displayed a firearm or threatened Dr. Surdacki.  Rather, after the gold
SUV rolled, Jones removed himself from the vehicle, put the gun in his
waistband, and pulled his shirt over the gun before waving to the doctor.  Jones
said that instead of threatening the doctor, he had lied to Dr. Surdacki,
telling him that his child was trapped in the SUV.  While Dr. Surdacki jogged
towards the gold SUV to help, Jones ran for Dr. Surdacki’s vehicle, jumped into
the vehicle, and drove off.

During cross-examination, Jones
agreed that State’s Exhibit 33, the semi-automatic gun recovered from Bundren’s
truck, was his gun, and he admitted that he had used it to steal Sulanc’s gold
SUV at Lowe’s.  Jones said that he had kept the gun’s magazine in his shoe and
that when he tried to take it out, he lost control of the gold SUV and it
rolled.  Jones stated that he had tried to remove the magazine from his shoe
because he was getting ready to load it, intending to use the gun on himself. 
The gun broke in the wreck.  Jones said that Dr. Surdacki had lied about Jones
using the gun to take his vehicle, even though he agreed that Dr. Surdacki had
no motivation to lie.

Jones said that he had tried to take
Jiminez’s car because he could not restart Dr. Surdacki’s vehicle.  Jones
agreed that he had pulled a gun on Jiminez, but he denied putting a gun to
Bundren’s head or pointing it at her head.  Jones conceded that Bundren had
seen the gun because it was in his hand and that he had held the gun to her
side.  He admitted that he had told Bundren that he was going to kill her, but
he claimed that he had let her go.

3.  Jones’s Motion for Continuance

At the conclusion of Jones’s
testimony on October 15, Jones’s counsel made the following request outside the
jury’s presence:

[Jones’s counsel]:  Okay.  Mr. Jones, my client, has asked me to have
two witnesses here.  This was discussed Monday of this week.  I had reviewed
these two witnesses’[] statements prior to coming to trial today, I mean, long
ago.  Each statement is one sentence.  Okay?  The witness—the first witness is
Don N. Cocanaugher. . . .  His written statement given to the Carrollton Police
Department says—and this is about when Mr. Jones is taking Dr. Surdacki’s car,
and his statement says, “Drove up to accident and seen black person get in SUV
and speed away.”  That’s it.

The next witness, I believe, is a person that was with this Cocanaugher
person.  Her name is Rebecca Self . . . and her statement says, “Drove up
behind SUV and saw person get into SUV and drive off.”  And, actually, her
statement is two sentences.  “The person was a black individual.”

Mr. Jones and I disagree on this.  I think these witnesses are
unimportant to his case, would not add anything to his case.  He wants these
witnesses here to testify.  I subpoenaed them.  The subpoenas have not been
returned served yet.  I didn’t know we’d get done this quickly, so I had them
scheduled to show up tomorrow at 9:00.

Mr. Jones wants me to ask you that we be allowed to recess or have a
continuance until I can see if these witnesses are going to be subpoenaed or
they’re going to be here at 9:00 tomorrow.  And if they are going to be here,
if I can get them here earlier, that they be allowed to testify either later
today or at 9:00 on Thursday.

[Prosecutor]:  May I, Your Honor?

THE COURT:  Okay.

[Prosecutor]:  Judge, my response to that is I would ask that you deny
the continuance.  First of all, [Jones’s counsel] asked that question to the
officer as to those witnesses.  Second of all, in light of the Defendant’s
testimony where he just admitted that he carjacked Dr. Surdacki at the Lowe’s (sic),
I think it’s moot.

[Jones’s counsel]:  I’m sorry, Judge.  She didn’t—he didn’t carjack him
at the Lowe’s.  I’m not trying to pick nits, but I want to make sure the record
is correct.  He carjacked Dr. Surdacki out on 544 in the middle of nowhere.

[Prosecutor]:  Sorry.  Carjacked Baki Sulanc at the Lowe’s and the
incident with Paul Palnau.  In light of the Defendant’s testimony, he said I
don’t deny what happened.  I don’t see how these witnesses are going to be
important in—and I don’t see any reason for us or for the Court to continue
this case for those two witnesses to be called, and I ask that you deny the
motion for continuance.

[Jones’s counsel]:  Judge, if I may explain real quickly, he believes
that they’re important because obviously his story—the difference from Dr.
Surdacki is that he did not have a weapon, and these two witnesses don’t say
anything about him having a weapon or anything.  And my opinion, based on my
training and experience as an attorney for ten years, is that they didn’t see
it, but they don’t have anything to offer the other way.  You know, they can’t
say, well, I’m for certain he didn’t do that or he didn’t have a gun.  That’s
why I don’t think they have anything to add to our case.  But he is my client. 
He’s asked me to do this.  It’s a difference in our opinion of his legal
strategy.

THE COURT:  Okay.  As—from what you’ve read there, what they’ve said, I
think that’s in evidence from two different people, two or three maybe, but
I—your client just said it, first off, I think, didn’t he?  Plus I’m sure the—I
think Dr. Surdacki said that they didn’t—all they—all they didn’t see anything
or something like that.  They just saw him drive off.

[Jones’s counsel]:  And that’s another reason, Your Honor, that I
believe that—I mean, they don’t add anything to our case, but, you know, I want
to be—I want to zealously advocate for my client.  He’s asking for a
continuance at this point so that I can try to wrangle these people up here. 
But—I me[an], it’s my understanding I’m allowed to do certain things, you know,
obviously in contravention of what he wants based on my—obviously, I can’t keep
him from testifying, but I can basically, you know, submit his legal strategy. 
And, Judge, I just ask that the two statements be entered for record purposes.

The trial court admitted the two
witnesses’ statements for record purposes.  Cocanaugher’s statement reads,
“Drove up to accident and seen [sic] black person get in SUV and speed away.”  Self’s
statement reads, “Drove up behind SUV and saw person get into SUV and drive
off.  Person was a black individual.”  The trial court then stated, “[a]s far
as the continuance to get these people here, I think their testimony in effect
would already be in evidence, so I’m going to deny the continuance.”  Jones
rested after the trial court denied his motion for continuance.

4.  Closing Arguments, Punishment,
and the Return of the Subpoenas

During closing arguments, the State
argued that the jury could consider Jones’s other July 23 offenses for intent,
motive, or identity.  Jones’s counsel responded that the State had brought the
witnesses from the other offenses because it did not believe Dr. Surdacki’s
version of events and that the State hoped the jury would find Jones guilty
because he had committed the other offenses.  With regard to Cocanaugher and
Self, Jones’s counsel argued,

You have
two people driving up as he’s getting in the vehicle, long flat stretch of
road, and they don’t say anything about, you know, we saw a gun or we saw
him, you know, getting a—Surdacki out of the car or anything like that. 
You don’t hear anything from those two witnesses.  They don’t tell the police
anything about that.  They say, we seen him getting in the car and he drives
off.

Well, who does that corroborate?  Does that corroborate Surdacki or
does that corroborate Mr. Jones’s testimony?  [Emphasis added.]

The State responded to Jones’s
counsel’s attack on Dr. Surdacki’s credibility by recounting all of the other
evidence supporting Dr. Surdacki’s version of events.  The jury took thirty-six
minutes to find Jones guilty of the offense as alleged in the indictment.  The
Cocanaugher and Self subpoenas were not returned unserved until after the trial
had already concluded.




 

C.  Analysis

After being granted an out-of-time
appeal by the court of criminal appeals, Jones filed a pro se motion for new
trial in which he alleged that his trial counsel had been ineffective for not
interviewing Cocanaugher and Self and complained that the trial court had
abused its discretion by denying his motion for continuance to obtain Cocanaugher
and Self as witnesses.  There is no indication that Jones presented the motion
for new trial to the trial court or secured a ruling on it.  See Tex. R.
App. P. 21.6.  And instead of attaching to his motion for new trial affidavits
from Cocanaugher and Self showing that they had been available to testify at
trial and what they would have testified at trial, Jones attached his unsworn
statement, which merely stated his belief that the two witnesses would have
corroborated his version of events.  We therefore have no record—beyond that
created at trial—to review with regard to Jones’s arguments about Cocanaugher
and Self.

While the record contains extensive
evidence supporting Jones’s conviction, all we have with regard to Cocanaugher
and Self are the following items: (1) their statements, which Officer
Adamo paraphrased during Jones’s counsel’s cross-examination for the jury, that
they drove up and saw a black person get in the vehicle and drive away; (2) Cocanaugher
and Self’s actual statements—which correspond to Officer Adamo’s summary and
which were entered for record purposes; and (3) Dr. Surdacki’s testimony that
Self and Cocanaugher were braking and stopping their truck as Jones took off in
Dr. Surdacki’s vehicle and that they told him that they were under the
impression that Dr. Surdacki had rolled the gold SUV and Jones had stopped to
offer help.

Further, although the record contains
some of Jones’s counsel’s reasoning for his actions with regard to Cocanaugher
and Self, in that he had reviewed their statements and thought that they would
not add anything to the case because “they don’t have anything to offer” as far
as seeing or not seeing any weapons, in his closing argument, Jones’s counsel was
able to argue that Cocanaugher and Self drove up as Jones was getting into Dr.
Surdacki’s vehicle, that they did not say anything about seeing a gun, and that
their statements corroborated Jones’s testimony because all they saw was Jones
get in the vehicle and drive off.  As postulated by the State, Jones’s counsel
might not have been able to make this argument if Cocanaugher and Self had actually
testified at trial.  And in light of the record before us, we cannot say that
there is a reasonable probability that, but for Jones’s counsel’s deficiency—if
any—the result of the trial would have been different.  See Strickland,
466 U.S. at 687, 104 S. Ct. at 2064; Davis, 278 S.W.3d at 352; see
also Perez v. State, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (noting
that counsel’s failure to call witnesses at the guilt-innocence stage is
irrelevant absent a showing that such witnesses were available and that
appellant would benefit from their testimony).  Therefore, we overrule the
remainder of his second issue.




 

IV.  Due Process

Jones argues in his first issue that
he was denied due process when the Denton County constable failed to serve subpoenas
to Cocanaugher and Self.  However, Jones did not raise this issue in his motion
for new trial—the only point at which he could have raised it, as the subpoenas
were not returned unserved until after the trial had concluded.  See
Tex. R. App. P. 33.1; Anderson v. State, 301 S.W.3d 276, 280 (Tex. Crim.
App. 2009) (stating that due process rights may be forfeited if not properly
preserved); see also Mendez v. State, 138 S.W.3d 334, 342 (Tex.
Crim. App. 2004).  And even if Jones had preserved this issue for our review,
because—as discussed above—there is no showing that either witness would have
testified to something material and beneficial to Jones’s case beyond what was
presented to the jury, we cannot say that Jones was harmed.  See Harrison v.
State, 187 S.W.3d 429, 433–34 (Tex. Crim. App. 2005).  Therefore, we
overrule Jones’s first issue.




 

V.  Conclusion

Having overruled both of Jones’s
issues, we affirm the trial court’s judgment.

 

 

BOB
MCCOY

JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT
and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: May 17, 2012 









[1]See
Tex. R. App. P. 47.4.





[2]The
trial court also granted the State’s motion to cumulate Jones’s life sentence,
stacking it on top of the life and ninety-nine-year sentences he had received
for related convictions in Collin County.





[3]There
is no indication that Jones’s motion was ever presented to the trial court or
that the trial court ruled on it.  See Tex. R. App. P. 21.6.





[4]Because
Jones states that regardless of when his counsel requested the subpoenas, “the
result would still be the same in that the subpoenas would have been returned
due to the witnesses[‘] addresses being outside Denton County,” we will not
address his failure-to-subpoena argument.  See Tex. R. App. P. 47.1.





[5]Jones’s
trial counsel raised a hearsay objection, but the trial court allowed Palnau’s
testimony about Dr. Surdacki’s statement under the excited utterance exception
for hearsay.  See Tex. R. Evid. 803(2).





[6]Jiminez
and his wife had gone to the truck stop to meet Bundren, his mother-in-law.





[7]The
trial court granted the State’s oral motion in limine that neither Jones nor
his counsel should go into the sentences that Jones had received for the
related offenses committed in Collin County because those were on appeal. 
Those sentences have since been affirmed. See Jones v. State,
Nos. 05-07-01234-CR, 05-07-01235-CR, 2008 WL 4881121, at *1 (Tex. App.—Dallas
Nov. 13, 2008, no pet.) (not designated for publication).





[8]Contrary
to Jones’s allegation in the unsworn statement attached to his pro se motion
for new trial—that he felt compelled to testify on his own behalf because
Cocanaugher and Self were not available to testify—nothing in the record
indicates why Jones decided to testify.